## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

DENNIS B.,[1]

        Plaintiff,

v.                                        Action No. 2:21cv612

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Dennis B. ("plaintiff") filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying his claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).  He asserts the Administrative Law Judge ("ALJ") failed to properly assess the opinion evidence of his treating psychiatrist.

An order of reference assigned this matter to the undersigned.  ECF No. 11.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 15) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 18) be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons.  Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

## I.   PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits on September 12, 2019, alleging he became disabled on February 5, 2015, and later amended that date to March 24, 2016.  R. 15, 162–65.[2]  Plaintiff alleges disability due to hypertension, severe anemia, meniscus tear, ACL injury, congestive heart failure, Sella Turcica tumor, stage 4 cirrhosis of the liver, occipital dysplasia, severe migraines, and memory loss.  R. 180.  Following the state agency's denial of his claim, both initially and upon reconsideration, plaintiff requested a hearing before an ALJ.  R. 68–78, 81–93, 117–18.  ALJ Carol Matula held a telephonic hearing on December 11, 2020, and issued a decision denying benefits on February 1, 2021.  R. 15–30, 36–67.  The Appeals Council denied plaintiff's request for review of the ALJ's decision on September 7, 2021.  R. 1–5.  Therefore, ALJ Matula's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed a complaint in this Court on November 11, 2021.  ECF No. 1.  The Commissioner answered on January 18, 2021.  ECF No. 9.  In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on April 25 and May 24, 2022, respectively.  ECF Nos. 15–19.  Plaintiff replied to the Commissioner's motion on June 15, 2022.  ECF No. 20.  As no special circumstances exist that require oral argument, the case is deemed submitted for a decision.

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

## II.   RELEVANT FACTUAL BACKGROUND

Plaintiff argues that the ALJ failed to properly evaluate opinion evidence submitted by his treating psychiatrist, Dr. William Lemley.  The Court's review of the facts below is tailored to these arguments.

### A.   *Background Information and Hearing Testimony by Plaintiff*

At a hearing before the ALJ on December 11, 2020, plaintiff provided the following information.  At that time, the 52-year old plaintiff lived in a house with his wife and a friend.  R. 41.  Plaintiff graduated high school and attended two years of college, but did not earn a degree.  R. 42.  Plaintiff served in the United States Navy from 1987 to 1993.  R. 46–47, 61.  Plaintiff worked as a driver and route coordinator for Bay View Plaza Pharmacy from 1993 to 2015 delivering bulk shipments of narcotics to hospitals.  R. 43, 182.  He supervised 27 drivers, handling hiring, firing, discipline, and any issues that arose with customers.  R. 43.  The pharmacy was bought by CVS and plaintiff continued working for CVS with diminished responsibility for less than one year, last working in 2016.  R. 43–44, 47.  Plaintiff receives military disability based on an 80% disability rating.[3]  R. 46–47.

For his depression and anxiety, plaintiff testified he takes medication, including gabapentin and buprofezin.  R. 52.  When he does not take his medications, he gets severe anxiety and feels like someone is going to hurt him.  R. 52–53.  He testified that the medication stabilizes his moods, which "made a big difference" and that he is "much happier now."  R. 53.  Plaintiff stated that his

---

[3] On October 23, 2013, the Department of Veterans Affairs issued a rating decision finding plaintiff had the following service-connected disabilities:  30% for headaches, 30% for coronary artery disease, 20% for radiculopathy in the left lower extremity, 10% for chronic fatigue, 10% for patellofemoral syndrome in the right knee, 10% for left foot pes planus, and 10% for degenerative disc and joint disease.  R. 46–47, 315.

3

daily anxiety is manageable with his medication, and that "Dr. [Lemley] has really gotten right where I need to be right now[, and] I feel really good with that." R. 58–59.

Due to concerns about catching COVID-19, plaintiff stated that he did not want to be around crowds and did not do "a whole lot." R. 53. He listened to audiobooks and drove to the American Legion. R. 55. While he previously enjoyed going to the pistol range, he testified to no longer going due to having a limited income. *Id.* Plaintiff testified that he drove to doctor appointments, the grocery store, and to the dog park "all the time." R. 42.

Plaintiff testified that his service dog died eight weeks prior to the hearing and that he had gotten a puppy three weeks prior to the hearing. R. 53–54. He stated that the first year of the dog's life "it's [his] job to socialize her, get her used to people, make sure that she's not afraid of anything, and then at a years' age, they can take her in and start training her to help [him] specifically with [his] needs." R. 54. Plaintiff explained that his previous service dog could detect when his blood sugar was too high or too low. *Id.* The dog could also detect when plaintiff's cortisone levels were getting high indicating an anxiety attack and would put her paws on his chest to make him sit down and would comfort him. *Id.* Plaintiff testified that it would be approximately 1½ years before his puppy could be similarly trained. *Id.*

In an October 2019 function report, plaintiff described his typical day as stretching in bed for 20 minutes, showering and taking his pills, taking his "emotional support . . . dog" to the dog park for obedience training until noon, eating lunch and watching television until 3:00 p.m., potentially taking a nap if his head is hurting from a migraine or headache, going to the dog park for a few hours, watching television, and going to bed. R. 196. Plaintiff reported that he handled stress and changes in routine badly. R. 197. Due to anxiety, depression, and PTSD, he mistrusted

4

people, avoided crowds, and chose to be alone with his dog. R. 197–98. He described not being able to leave the house due to fear that he would get hurt and that there was "someone around every corner." R. 203. However, he drove his friend to work on occasion and hung out with his friend twice a month, drove to Home Depot and Walmart on a regular basis, and shopped for groceries once each week. R. 199–200. Plaintiff reported that being on anxiety medication has helped "alot" with respect to getting along with authority figures. R. 197.

## B.    *Hearing Testimony by Vocational Expert*

Patricia Murphy, a vocational expert ("VE"), testified at the hearing. R. 62. Based on the ALJ's hypotheticals, VE Murphy opined that someone with plaintiff's age, education, work history, and residual functional capacity ("RFC") could not perform plaintiff's past relevant work, but could perform certain unskilled jobs in the national economy, such as document specialist, caller/operator, and addresser. R. 62–65. VE Murphy further testified that someone who needed to have an emotional support dog with him during the workday would be precluded from work, and that someone off-task more than ten percent or with unscheduled absences more than once per month would also be precluded from work. R. 65.

## C.    *Relevant Mental Health Treatment and Examinations*

### 1.    **Hampton VA Medical Center**

#### a.    **Philip G. Schlobohm, M.D., Psychiatrist**

In November 2015, over four months prior to plaintiff's alleged disability onset date of March 24, 2016, Dr. Schlobohm saw plaintiff for medication management and supportive psychotherapy. R. 582–84. Dr. Schlobohm noted that plaintiff was initially evaluated by another doctor in December 2014 for anxiety and depression and placed on sertraline. R. 582. His

5

medications had been filled by his primary care physician, but he had been referred to Dr. Schlobohm because the medications were not working as well as they had in the past. *Id.* Plaintiff described mood swings, anxiety, hypervigilance, sensitivity to loud sounds, difficulty trusting, insomnia, and nightmares. *Id.* Plaintiff explained that the company he worked for had been acquired by another company resulting in more work with less pay; his wife had to stay in the home to care for her mother with Alzheimer's; the grown "daughter" he intended to adopt was also in the house with her two children; his good friend was dying of cancer; and, caring for his friend and "daughter," who was a burn victim, caused plaintiff to have flashbacks to his combat experience. *Id.* Plaintiff was casually dressed, pleasant, cooperative, alert, oriented, with coherent and relevant speech in a normal rate and tone, good eye contact, well organized thoughts, no delusions or hallucinations, a full range of affect, and his insight and judgment were not impaired. *Id.* Dr. Schlobohm noted that plaintiff's mood was anxious, prescribed prazosin for nightmares and trazodone for sleep modulation, and directed plaintiff to continue sertraline and return in one month. R. 584.

In February 2016, plaintiff returned to Dr. Schlobohm indicating that prazosin had diminished the frequency and intensity of his nightmares, but that he still was not sleeping well. R. 506–07. Plaintiff reported that the pharmacy was sending him to school to be certified as a pharmacy tech, but that he was having difficulty focusing and retaining information. R. 506. Plaintiff's mental health evaluation was normal—he was casually dressed, pleasant, cooperative, alert, oriented, with coherent speech at a normal rate and tone, good eye contact, well organized thoughts, no delusions or hallucinations, euthymic mood with full range of affect, and his insight and judgement were not impaired. *Id.* Dr. Schlobohm diagnosed anxiety and attention deficit

disorder, prescribed bupropion for focus, and increased the trazodone prescription to help modulate sleep. R. 509.

In March 2016, Dr. Schlobohm spoke with plaintiff by telephone. R. 484. Plaintiff indicated he was pleased with his medications, bupropion and sertraline, which were making him feel better and more focused. *Id.* He reported not getting angry as quickly and not eating when he was anxious. *Id.* Dr. Schlobohm directed plaintiff to schedule a follow-up telephone appointment in four weeks. *Id.*

In an April 2016 telephone appointment, plaintiff told Dr. Schlobohm that he had been more depressed and anxious without nightmares for the previous three weeks due to losing his job and worrying about finances. R. 455. Plaintiff reported that he was looking for another job. *Id.* Dr. Schlobohm recommended increasing plaintiff's prescription for bupropion, prazosin, and trazodone and instructed him to follow up in two weeks. *Id.*

**b.    Joanne Shovlin Saal, Staff Psychologist**

In January 2016, a few months prior to plaintiff's alleged onset date, psychologist Saal evaluated plaintiff for PTSD at the request of Dr. Schlobohm. R. 318–19. During the evaluation, plaintiff described his Navy service, including an eight to nine month deployment to Saudi Arabia in 1990–91 where he worked in a hospital prepping bodies for burial. R. 319, 886. He reported that the hospital was hit by SCUD missiles requiring everyone to take cover, and that chemical warfare alarms required him to wear a gas mask. R. 319. Plaintiff reported anger issues, sleep disturbance, detachment, and mood swings. R. 319–21. Plaintiff noted that he enjoyed his job and interacting with others. R. 322. He explained that he had angry outbursts at home but not at work or in public. R. 320. Plaintiff reported that he was diagnosed with bipolar disorder 12 to 13

years ago, and that he had been on his current medications (sertraline, trazodone, prazosin, and cyclobenzaprine) for one year.  R. 321.

Dr. Saal noted that plaintiff had been seen in the mental health center in February 2013 and was found to have anxiety not otherwise specified.  R. 319.  Dr. Saal found that plaintiff's anger issues and sleep disturbance "appear to be more related to situational issues – family stress from [his] mother-in-law" who has Alzheimer's and lives with them, a transition at work due to a company merger resulting in a pay cut and reduced control over his job, "and/or possible underlying Bipolar II disorder."  R. 320.  Dr. Saal noted that

> [t]hese symptoms are not demonstrated to be chronic and while there may be marital stress from anger issues, there is no disturbance in occupational functioning or a change in social functioning (has 5 military peers he stays in contact with and 4 friends from childhood; was more active socially until 2 years ago due to inability to leave mother-in-law at home alone) from pre-military level.

*Id.*

Dr. Saal found plaintiff "[e]ndorses mild depression" due to physical restrictions, and that plaintiff's social outings have been restricted due to caregiver duties.  R. 321.  Following a mental status examination, Dr. Saal found plaintiff's speech and cooperation within normal limits, his behavior was reserved, his affect euthymic, and his mood was self-described as depressed.  R. 322. His insight and judgment were low and his quality of thought/speech patterns was "vague at times and circumstantial at others."  *Id.*  He had no suicidal or homicidal ideation or plans, delusions, hallucinations, or flashbacks.  *Id.*

Dr. Saal assessed plaintiff with generalized anxiety disorder, depression, attention deficit disorder by history, "[rule out] Bipolar II disorder," and "[rule out] mood disturbance from medical conditions."  R. 323.  She found plaintiff did not meet the criteria for military related PTSD.  *Id.*

8

c.      **John Mattison Davis, M.D., Psychiatrist**

In October 2016, plaintiff had a mental health consult with Dr. Davis. R. 910–13. Plaintiff reported that he had been out of work for six months, "and the lack of structured and purposeful activity has been difficult for him." R. 910. Dr. Davis performed a mental status exam and reported normal results—normal grooming, casual dress, cooperative and polite behavior, fully oriented, attention and concentration within normal limits, intact memory, good eye contact, no involuntary movements, normal speech and language, "OK" mood, reserved and calm affect that was appropriate to content, no psychotic thoughts, no suicidal or homicidal ideation, fair insight and judgment, and an adequate fund of knowledge. R. 912. Dr. Davis assessed unspecified anxiety disorder related to multiple stressors, past reported diagnosis of ADHD, and nicotine use. *Id.* Dr. Davis found plaintiff did not meet the criteria for PTSD. R. 911. Dr. Davis offered to refer plaintiff to behavioral health personnel, but plaintiff preferred to follow up with Dr. Schlobohm. R. 913.

d.      **Alexis L. Zornitta, Psychologist**

In June 2018, Dr. Zornitta evaluated plaintiff for PTSD. R. 886–89. Plaintiff described his Navy service and deployment. R. 886. Plaintiff described nightmares, avoiding crowds, irritability, anger, depression, and anxiety. R. 886–87. Plaintiff explained that he was diagnosed with bipolar disorder in the 1990s by an outside provider who "only spoke to me for 15 minutes and said I had Bipolar Disorder." R. 887. Plaintiff indicated that his medications helped with his anger issues, and he "does not get angry anymore." *Id.* Plaintiff's mental status examination was normal—neat appearance, appropriately dressed and groomed, coherent speech within normal limits for rate, tone, and modulation, pleasant, cooperative behavior, high level of cooperation, euthymic mood (self-described), congruent affect, no suicidal or homicidal ideations, no delusions,

9

goal directed quality of thought and speech patterns with intact associations, no hallucinations or flashbacks observed during session, and his insight and judgment were within normal limits. R. 888.

Dr. Zornitta diagnosed unspecified bipolar and related disorder, other specified trauma and stressor related disorder (partial PTSD), unspecified anxiety disorder, and mild cannabis use disorder (plaintiff indicated that he smokes marijuana two to three times each week). R. 888–89. Dr. Zornitta found plaintiff did not meet the criteria for military related PTSD, and referred plaintiff to outpatient mental health in Chesapeake for anxiety (unrelated to PTSD) and bipolar-like symptoms. *Id.*

### 2.    Chesapeake VA Clinic - William H. Lemley, Psychiatrist

Dr. Lemley evaluated plaintiff in July 2018, for generalized anxiety disorder. R. 884. Plaintiff reported good results from sertraline and prazosin, and requested an increase in his sertraline prescription due to feeling "argumentative and aggressive." *Id.* Dr. Lemley performed a mental status examination and noted normal findings—plaintiff was casually dressed with normal grooming and hygiene, calm and cooperative with no unusual movements or psychomotor changes, normal speech, euthymic mood, reactive affect and congruent mood, no suicidal or homicidal ideations or plans, no delusions, phobias, obsessions, or compulsions, no hallucinations or delusions during interview, oriented, stable memory and concentration for recent and remote events, and good insight and judgment. R. 885.

Dr. Lemley assessed plaintiff with unspecified anxiety disorder, history of unspecified bipolar and related disorder, mild cannabis use disorder, and "other specified trauma and stressor related disorder, partial PTSD." *Id.* Dr. Lemley switched plaintiff to Lexapro for mood swings,

continued plaintiff on prazosin and bupropion, and instructed plaintiff to follow up in 12 weeks. R. 885–86.

Over 19 months later, in February 2020, Dr. Lemley conducted a follow up visit. R. 1092–95. Aside from noting that plaintiff's mood was "jittery," Dr. Lemley noted normal findings on his mental status examination. R. 1093. Plaintiff had recently traveled to the Superbowl in Miami for six days. R. 1096. Dr. Lemley's diagnosis remained the same as in July 2018, he increased plaintiff's dose of Lexapro and bupropion, and instructed him to follow up in 12 weeks. R. 1094.

In May 2020, plaintiff had a telehealth video visit with Dr. Lemley. R. 1334–39. Plaintiff reported mild depression during the pandemic, but Dr. Lemley noted he "seems to be weathering it well." R. 1335. Plaintiff also explained that his "long time companion dog" had hip dysplasia. *Id.* Plaintiff stated that his anxiety was not as intense, but he had a feeling of "something bad happening sometimes when leaving the house." *Id.* Plaintiff reported impaired sleep due to stopping prazosin. *Id.* Plaintiff's mental status exam was normal. R. 1336. Dr. Lemley continued plaintiff on his medication, adding Topamax for nightmares. R. 1338.

In August 2020, plaintiff had a telehealth appointment with Dr. Lemley. R. 1220–22. Plaintiff requested another letter "certifying his emotional support dog as he has in the past." R. 1220; *see* R. 1017 (notes from a care coordination telehealth appointment regarding plaintiff's heart condition in October 2019, indicating plaintiff suffers from stress, anxiety, depression and PTSD, and reported "us[ing] a service dog"). Plaintiff reported his medication is working "pretty good." R. 1220. Dr. Lemley noted normal results following a mental health examination. R. 1220. Dr. Lemley continued plaintiff on his medications, adding a trial of melatonin for sleep initiation. R. 1222.

### D.     Medical Opinions

#### 1.     Consultative Examination—August 2016

In August 2016, Shawne Bryant, M.D., performed a consultative examination directed primarily towards plaintiff's physical impairments. R. 837–45. Dr. Bryant noted plaintiff's report of depression and anxiety for which he was receiving medication and counseling. R. 838, 844. Dr. Bryant found plaintiff had good eye contact, fluent speech, an appropriate mood, clear thought processes, normal memory, good concentration, and was fully oriented. R. 842. Dr. Bryant concluded that "[t]here may be some relevant communicative limitations due to depression and anxiety and further psychiatric testing may be beneficial." R. 845.

#### 2.     State Agency Physician Reviews—December 2019 and June 2020

In December 2019, Howard S. Leizer, Ph.D., a state agency consultant, reviewed plaintiffs' medical record. R. 72–73. Dr. Leizer evaluated plaintiff under the criteria for the following listings: 12.04 for depressive, bipolar, and related disorders; 12.06 for anxiety and obsessive-compulsive disorders; 12.08 for personality and impulse-control disorders; and, 12.15 for trauma and stressor-related disorders. R. 73. He found plaintiff had no limitations in his ability to understand, remember, or apply information, and mild limitations in his ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage himself. *Id.* Dr. Leizer explained that plaintiff has no suicidal ideation, hallucinations or hospitalizations; "reports having a dog for emotional support that he takes to the park 2x/day"; reports that his anxiety medication has helped a lot; can go out alone and drives to Home Depot and Walmart; drives friends to work on occasion; manages funds and shops online and in stores weekly; can take care of himself; and, can manage his medications and follow instructions. *Id.* Dr. Leizer concluded that, based on his

12

activities of daily living and treatment, plaintiff had mild mental health limitations. *Id.*

In June 2020, Eric Oritt, Ph.D., a state agency consultant, reviewed plaintiff's medical record. R. 86–88. Dr. Oritt evaluated plaintiff for the same listings as Dr. Leizer and assessed plaintiff with the same limitations. *Id.*

### 3.    Dr. Lemley's service dog letters—January 2019 and December 2020

In January 2019, and again in December 2020, Dr. Lemley signed letters stating:

To Whom It May Concern:

This letter is in support of [plaintiff] having a medical alert service dog.

Due to [plaintiff's] condition, it would be therapeutic for him to be accompanied by a service dog. It is medically necessary at this time.

Sincerely,
William Lemley, MD

R. 1176.

### 4.    Medical Assessment by Dr. Lemley—December 2020

On December 7, 2020, Dr. Lemley completed a medical evaluation report indicating he treated plaintiff from June 2018 through December 2020 and listing the following impairments: other specified trauma and stressor related disorder, partial PTSD, unspecified anxiety disorder, a history of unspecified bipolar and related disorder, and cannabis use disorder. R. 1170. Dr. Lemley opined that plaintiff's prognosis was "good with therapy and medications." *Id.* Dr. Lemley checked boxes indicating plaintiff had mostly mild limitations with respect to the overall category of social interaction and mostly moderate limitations with respect to the overall categories of understanding and memory, sustained concentration and persistence, and adaptation. R. 1170–71. Dr. Lemley indicated plaintiff was markedly limited in his ability to perform the following

13

specific tasks within the above categories: (a) understand, remember, and carry out detailed instructions; (b) maintain attention and concentration for extended periods; (c) complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (d) travel in unfamiliar places or use public transportation. *Id.*

### III.    THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[4] the ALJ followed the five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 404.1520(a).  Specifically, the ALJ considered whether plaintiff:  (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents him from performing any past relevant work in light of his RFC; and (5) had an impairment that prevents him from engaging in any substantial gainful employment.  R. 17–29.

The ALJ found that plaintiff met the insured requirements[5] of the Social Security Act through December 31, 2021, and had not engaged in substantial gainful activity from March 24,

---

[4] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a).  To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. *Id.*

[5] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

2016, his alleged onset date of disability. R. 17.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) mild area of cardiac ischemia; (b) obesity; (c) mild degenerative disc disease of the lumbar spine; and (d) status post coronary artery bypass grafting in 2005. *Id.* The ALJ classified plaintiff's other physical impairments as non-severe[6] because "they are responsive to medication, do not require any significant medical treatment, or do not result in any continuous exertional or nonexertional functional limitations." R. 17–18. The ALJ found that plaintiff's medically determinable mental impairments "considered singly and in combination, do not cause more than minimal limitation in the [plaintiff]'s ability to perform basic mental work activities and are therefore non-severe." R. 18.[7] In making this determination, the ALJ noted that plaintiff's mental impairments have been treated only conservatively and respond to medication, and his mental status examinations show many normal findings. *Id.* The ALJ determined that plaintiff's severe impairments, either singly or in combination (along with his other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 19–20.

The ALJ next found that plaintiff possessed an RFC for less than a full range of light work,

---

[6] The ALJ listed the following physical impairments that were non-severe: minimal right knee chondromalacia, migraines and occipital neuralgia, hypertension, anemia, congenital pes planus, hepatosplenomegaly, cirrhosis of the liver, chronic kidney disease, obstructive sleep apnea, history of phalanx fracture and subungual hematoma, carotid stenosis, diabetes mellitus, portal hypertensive gastropathy, hyperlipidemia, colon polyp, GERD, thrombocytopenic disorder, laceration, history of pituitary tumor, and irritable bowel syndrome. R. 17–18.

[7] The ALJ listed the following mental impairments that were non-severe: other specified trauma and stressor-related disorder, partial PTSD; unspecified anxiety disorder; history of unspecified bipolar and related disorder; cannabis use disorder, depression, generalized anxiety disorder, and attention deficit disorder by history. R. 18.

*see* 20 C.F.R. § 404.1567(b), subject to the limitations that he: (a) only stand and walk for 4 hours; (b) only occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; (c) never climb ladders, ropes, or scaffolds; (d) never be exposed to unprotected heights or moving mechanical parts; (e) only occasionally be exposed to dusts, odors, fumes, pulmonary irritations, and noise above office level; and (f) only perform simple, routine tasks. R. 20–28.

At step four, the ALJ found that plaintiff could not resume any past relevant work, including working as a delivery route driver, delivery driver supervisor, or department manager. R. 28. Finally, at step five, the ALJ found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC, that plaintiff could perform other jobs in the national economy, such as cashier II, document specialist, and call out operator. R. 28–29. Accordingly, the ALJ concluded plaintiff was not disabled from March 24, 2016, through February 1, 2021, and was ineligible for a period of disability or DIB. R. 29–30.

## IV.     STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154

16

(2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *See Id.*

## V.   ANALYSIS

Plaintiff seeks a remand arguing that the ALJ failed to properly assess the opinions of his treating psychiatrist, Dr. William Lemley. Pl.'s Mem. In Supp. Mot. Summ. J. ("Pl.'s Mem."), ECF No. 16, at 8–14. Specifically, plaintiff argues the ALJ did not sufficiently explain why he found the opinions to be unpersuasive through the lenses of supportability and consistency, as required by the regulations. *Id.* at 10 (citing 20 C.F.R. § 404.1520c(b)(2)). Plaintiff contends the ALJ did not cite any specific evidence of record, "made vague reference to 'good mental status examinations,'" cherrypicked from the record, and failed to cite findings consistent with Dr. Lemley's opinions. *Id.* at 8–11. Plaintiff further argues that, if the ALJ had properly evaluated Dr. Lemley's opinion that an emotional support dog was medically necessary for plaintiff, "a

finding of disability would have been directed" because the vocational expert testified that such an accommodation would preclude all work. *Id.* at 14. Due to these errors, plaintiff asserts the ALJ's decision is not supported by substantial evidence, necessitating a remand for further proceedings. *Id.*

The Commissioner argues that the ALJ adequately explained his reasons for finding the opinions of Dr. Lemley unpersuasive and that substantial evidence supports his decision, allowing the Court to meaningfully review the opinion. Mem. Supp. Def.'s Mot. Summ. J. and in Opp'n Pl.'s Mot. Summ. J. ("Def.'s Mem."), ECF No. 19, at 13–20. The Commissioner addressed how the ALJ considered Dr. Lemley's assessment and letters and adequately explained "why she found his opinions unpersuasive, unsupported, and inconsistent with other evidence in the record." *Id.* at 15–19.

A. ***The SSA's methodology for considering medical opinions for claims filed after March 27, 2017, applies to this case.***

The SSA revised its evidence rules for claims filed on or after March 27, 2017. 82 Fed. Reg. 5844, at 5853–55 (Jan. 18, 2017); *see also* 82 Fed. Reg. 15132 (Mar. 27, 2017) (correcting technical errors in final rule). Plaintiff filed his application for DIB in 2019, and the revised rules apply to his case. R. 162–65.

The revised regulations dispensed with the treating physician rule. *See* 20 C.F.R. § 404.1527(c)(2); *see also Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 255–56 (4th Cir. 2017). The SSA also rescinded Social Security Ruling ("SSR") 96-2p, which discussed how to weigh treating source opinions. 82 Fed. Reg. 15263-01, at 15263 (Mar. 27, 2017). The new rules, contained in 20 C.F.R. § 404.1520c, direct the ALJ to "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical

finding(s)." 20 C.F.R. § 404.1520c(a).  The ALJ must, however, still explain her consideration of the opinions in relation to the following factors: (1) supportability, or the relevance and strength of explanations for the opinion, (2) consistency, or the similarity with other opinions, (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the relationship, and extent of the relationship, (4) specialization, relating to the training of the source, and (5) other factors, including but not limited to the source's familiarity with other medical evidence and the SSA's policies and requirements.  20 C.F.R. § 404.1520c(a), (c).  The rule also explains the ALJ is only required to articulate the supportability and consistency factors when discussing an opinion and need only address the other factors when relevant and at her discretion.  20 C.F.R. § 404.1520c(b)(2).

The ALJ is also obliged by Social Security Ruling 96-8p to "include a narrative discussion describing how the evidence supports each conclusion." *Monroe v. Colvin*, 826 F.3d 176, 190 (4th Cir. 2016) (quoting *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015)).  Remand may be appropriate when a court must guess how the ALJ arrived at the conclusions and meaningful review is frustrated.  *Mascio*, 780 F.3d at 636–37.

**B.**     ***The ALJ committed no error in evaluating the medical opinions of Dr. Lemley.***

**1.**     **The ALJ properly considered Dr. Lemley's medical assessment.**

Dr. Lemley's December 2020 assessment concluded plaintiff had mostly mild limitations with respect to the overall category of social interaction and mostly moderate and some marked limitations with respect to the overall categories of understanding and memory, sustained concentration and persistence, and adaptation.  R. 1170–71.

Having reviewed the entire record, the ALJ determined that Dr. Lemley's findings with respect to plaintiff's limitations were not persuasive

> as they are not well-supported and are not consistent with the record as a whole. [Plaintiff] has had only conservative treatment for his mental impairments with no treatment 2018–2020. Nothing in Dr. Lemley's treatment notes support these limitations. As noted above, for example, [plaintiff] has had good mental status examinations. [Plaintiff] did have some temporary limited memory decrease due to hyperammonia in 2020, but generally there is no objective evidence of significant cognitive deficit. Therefore, the undersigned does not adopt the limitations described by Dr. Lemley at Exhibit 10F.

R. 26.

Plaintiff contends that the ALJ's discussion of consistency and supportability is not legally sufficient because "the ALJ did not cite any specific evidence of record but made vague reference to 'good mental status examinations.'" Pl.'s Mem. 10. Plaintiff argues that the ALJ cherrypicked from the record by citing generally to normal mental examination findings "while ignoring and minimizing evidence supporting severe mental symptoms." *Id.* at 11; *see Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017) (holding an ALJ "has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding"). For the following reasons, plaintiff's arguments are not persuasive.

The ALJ did cite to the record and explain her evaluation of Dr. Lemley's opinions. In determining that Dr. Lemley's opinions were not persuasive, the ALJ relied on plaintiff's conservative mental health treatment, lack of any treatment for 19 months from 2018 to 2020, and multiple normal mental status examinations. R. 26. The first time the ALJ discussed plaintiff's conservative mental health treatment, and normal mental status examinations in the opinion, she cited to the relevant record evidence. *See* R. 18 (citing to the VA Medical Center notes generally,

and specifically to the record cites for 10 normal mental status exams). The ALJ appropriately referenced this discussion later when she explained why Dr. Lemley's opinions were not persuasive. R. 26 (stating, "[a]s noted above"). The ALJ need not repeat pertinent findings multiple times throughout a ruling for the purpose of supporting individual conclusions. *See McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) (noting "that the ALJ need only review medical evidence once in his decision"); *Kiernan v. Astrue*, No. 3:12cv459, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013) (observing that, where an "ALJ analyzes a claimant's medical evidence in one part of his decision, there is no requirement that he rehash that discussion" in other parts of the analysis).

In finding Dr. Lemley's opinions were not consistent with the record, the ALJ relied on conservative mental health treatment consisting primarily of managing plaintiff's mental health symptoms with medications, which plaintiff reported "were working well." R. 18 (citing R. 270–835, 847–999, 1220–22); *see* R. 582 (plaintiff was initially referred to Dr. Schlobohm in 2015, prior to his alleged onset date, because his medications were not working as well as they had in the past); R. 484 (in March 2016, plaintiff reported to Dr. Schlobohm that he was pleased with his medications, which were making him feel better and more focused and kept him from getting angry as quickly); R. 887 (in June 2018, plaintiff indicated that his medications helped with his anger issues, and he "does not get angry anymore"); R. 197 (in October 2019, plaintiff reported that being on anxiety medication helped "alot" with respect to getting along with authority figures); R. 1220 (in August 2020, plaintiff reported to Dr. Lemley that his medication is working "pretty good"); R. 1170 (in December 2020, Dr. Lemley opined that plaintiff's prognosis was "good with therapy and medications"); R. 53 (in December 2020, plaintiff testified that his daily anxiety is

21

manageable with his medication, which stabilizes his moods, "made a big difference," and he is "much happier now"). The ALJ also relied on the lack of any mental health treatment for 19 months, from July 2018 to February 2020. R. 26.

The ALJ further relied on mental status examinations performed by mental health professionals other than Dr. Lemley from 2014 to 2018 to find Dr Lemley's opinions were not consistent with the record. R. 18, 26. The normal mental status examinations specifically cited by the ALJ include examinations conducted by physician's assistant Jennings in August 2014, Dr. Schlobohm in February 2016, consultative examiner Dr. Bryant in August 2016, Dr. Davis in October 2016, and Dr. Zornitta in June 2018. R. 18 (citing R. 507, 795, 842, 888, 912). In addition, the ALJ specifically cited to the records from these doctors as well as Dr. Lemley when determining plaintiff had mild or no limitations with respect to the functional areas addressed in Dr. Lemley's assessment. R. 18–19.

With respect to supportability of Dr. Lemley's assessment, the ALJ cited to Dr. Lemley's treatment notes reporting normal mental status examinations in July 2018, February 2020, May 2020, and August 2020. R. 18 (citing R. 885, 1093, 1220, 1336). These four examinations are the only mental status examinations performed during Dr. Lemley's treatment of plaintiff. *Id.* Dr. Lemley's findings in these mental status examinations do not support the multiple moderate and marked limitations contained in his assessment, and the assessment itself provides no explanation for the limitations. R. 1170–71.

In support of plaintiff's argument that the ALJ cherrypicked from the record while ignoring evidence of severe mental illness, he cites to several treatment records. Pl.'s Mem. 12–13. He references Dr. Schlobohm's November 2015 assessment where plaintiff's description of

22

symptoms, including mood swings, hypervigilance, and insomnia prompted Dr. Schlobohm to recommend a PTSD evaluation. R. 582. This assessment predates plaintiff's alleged onset date. Further, with the exception of noting that plaintiff's mood was "anxious," plaintiff's mental status examination was normal. *Id.*

Plaintiff next references the PTSD evaluation by Dr. Saal, which also predates his alleged onset date. Pl.'s Mem. 12–13. Plaintiff highlights his reports to Dr. Saal of anger problems, living "day by day," poor sleep, and previous bipolar diagnosis. *Id.* Dr. Saal did find that plaintiff "[e]ndorses mild depression" due to physical restrictions, his behavior was reserved, his insight and judgment were low, and his quality of thought/speech patterns was "vague at times and circumstantial at others." R. 321–22. The remaining mental status examination findings, however, were normal. R. 322–23. Moreover, Dr. Saal noted that plaintiff's "symptoms are not demonstrated to be chronic and . . . there is no disturbance in occupational functioning or a change in social functioning . . . from pre-military level." R. 320.

Next, plaintiff references a telephone encounter with Dr. Schlobohm in April 2016. Pl.'s Mem. 13. During the call, plaintiff reported he had been more depressed and anxious due to losing his job, and Dr. Schlobohm increased his medication dosage. R. 455.

Lastly, plaintiff references Dr. Davis's mental health consult in October 2016 that resulted in a normal mental status examination. Pl.'s Mem. 13; R. 912. Although plaintiff focuses on his subjective complaints during these evaluations, the objective findings by the mental health professionals during the evaluations, including the consistently normal mental status findings and recommendations that plaintiff manage his mental health symptoms with medication, support the ALJ's conclusions. Despite finding Dr. Lemley's opinions to be unpersuasive, the ALJ

23

nevertheless determined that plaintiff's residual functional capacity limited him to performing simple, routine tasks, and recognized that this limitation prevented plaintiff from returning to his past relevant work. R. 20–28.

Having reviewed the entire record, the ALJ identified sufficient grounds for finding Dr. Lemley's opinions unpersuasive and relied upon other, more probative record evidence establishing that plaintiff had no more than mild limitations.

### 2.     The ALJ properly considered Dr. Lemley's letters.

In January 2019 and again in December 2020, Dr. Lemley signed letters addressed "To Whom It May Concern" indicating that, "[d]ue to [plaintiff's] condition, it would be therapeutic for him to be accompanied by a service dog. It is medically necessary at this time." R. 1176.

The ALJ found these letters unpersuasive, writing

> they are not well-supported or consistent with the record as a whole. At least one
> of these statements was written at the [plaintiff]'s request rather than being part of
> the [plaintiff]'s routine treatment (12F/43). There is reference to a service dog
> (6F/19) or companion dog (12F/158) or emotional support dog (12F/43) in the
> record, but there is no prior prescription as the [plaintiff] testified there was, and
> the [plaintiff] is not seen with his dog at any visits. Per the [plaintiff]'s testimony,
> his dog died in about October 2020, and he has a puppy which will not be "trained"
> for 1 year. [Plaintiff] testified that his dog was for his mental health and to let him
> know if his blood sugar was too high, but there is nothing in the record to show that
> his dog was trained to do anything. An emotional support dog is not a service dog,
> . . . which is individually trained to do work or perform tasks for a person with a
> disability (US DOJ, Civil Rights Division, www.ADA.gov).  [Plaintiff]'s . . .
> limited mental health treatment and mental status examinations, do not support the
> need for a dog to help for his mental health. Dr. Lemley's assessments are vague
> as to why he believes the [plaintiff] needs a service dog. Therefore, the undersigned
> does not accept Dr. Lemley's assessment in this regard.

R. 26–27.

Plaintiff argues that, if Dr. Lemley's opinion—that an emotional support dog was medically necessary for plaintiff—had been properly evaluated, "a finding of disability would have

been directed" because the vocational expert testified that such an accommodation would preclude all work. Pl.'s Mem. 14.

The ALJ did not find the letters to be consistent with the plaintiff's treatment record. R. 26–27. The ALJ discusses notes in the record where plaintiff used the terms "service dog," "emotional support dog," and "companion dog" interchangeably. R. 26; *see* R. 1017 (in October 2019, plaintiff reported anxiety, depression, stress, and PTSD for which he "uses a service dog"); R. 196 (in October 2019, reporting he takes his "emotional support animal" to the dog park daily); R. 1335 (in May 2020, reporting to Dr. Lemley that his "long time companion dog" had hip dysplasia); R. 1220 (in August 2020, requesting that Dr. Lemley write another letter "certifying his emotional support dog"). The ALJ further notes that no other provider has prescribed use of a dog, plaintiff was not seen with his dog during any of his in-person appointments, and plaintiff did not have a service dog at the time of the hearing and would not have a trained dog for at least one year after the hearing. R. 26–27. The ALJ again referenced plaintiff's normal mental status examinations, and found that plaintiff's limited mental health treatment did not support Dr. Lemley's opinion that a service dog is medically necessary due to plaintiff's mental health issues.

With respect to supportability, the ALJ indicates that at least one of the letters was written following plaintiff's request rather than Dr. Lemley writing the letter as part of plaintiff's routine treatment. R. 26. The ALJ further notes that Dr. Lemley's letters are vague as to why he believes a service dog is medically necessary for plaintiff. R. 27. Aside from the notations indicating plaintiff's "long time companion dog" had hip dysplasia and plaintiff's request for a letter "certifying [an] emotional support dog," there are no notations in Dr. Lemley's treatment records

indicating plaintiff required the assistance of a dog due to his mental health issues. R. 1220, 1335.

Moreover, the letters do not contain any explanation for why a service dog is being recommended.

Here, the evidence reflects that the ALJ properly reviewed Dr. Lemley's opinions and found them lacking support and inconsistent with plaintiff's mental health treatment. Based on that analysis, ample grounds existed for the ALJ to find the opinions in Dr. Lemley's assessment and letters to be unpersuasive.

**C.** **_Substantial evidence in the record supports the ALJ's decision._**

The ALJ's decision is well-supported by the medical record in this case, including the notes of Drs. Schlobohm, Davis, and Zornitta; Dr. Lemley's own treatment notes; as well as the opinions of the two state agency physicians, Drs. Leizer and Oritt, who both found plaintiff had only mild limitations due to his mental health impairments. R. 25–26. The ALJ's decision is further supported by the plaintiff's reported activities recounted by the ALJ, such as driving, going out alone to stores and the dog park, driving a friend to work on occasion, shopping, interacting with family and friends, and handling money. R. 18–19, 25. Accordingly, the Court concludes that the ALJ's determination that plaintiff's mental health impairments were not disabling, he remained able to perform a limited range of light work as set forth in the RFC, and he possessed the capability to successfully adjust to other available work, is supported by substantial evidence.

## VI.    <u>RECOMMENDATION</u>

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 15) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 18) be **GRANTED**.

26

## VII.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).


_____
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
October 5, 2022

27